**CLERK'S OFFICE**
**A TRUE COPY**
Apr 29, 2021
s/ Daryl Olszewski
**Deputy Clerk, U.S. District Court**
**Eastern District of Wisconsin**

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No.   21   MJ   119 |
| Cellular telephone assigned number (312) 834-6433 ("TARGET CELL PHONE") | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) & 846 | Distribution and Conspiracy to Distribute a Controlled Substance (heroin) |

The application is based on these facts:

See attached Affidavit

❒ Continued on the attached sheet.

☑ Delayed notice of __180__ days *(give exact ending date if more than 30 days:*  __10/26/2021__  *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
TODD HIGGINS (Affiliate)    Digitally signed by TODD HIGGINS (Affiliate)
                            Date: 2021.04.29 15:05:47 -04'00'
*Applicant's signature*

Todd Higgins, DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:   April 29, 2021
_____
*Judge's signature*

City and state:  Milwaukee, Wisconsin
William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, DEA Task Force Officer Todd Higgins, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (312) 834-6433, with listed subscriber Rene Suarez (the "TARGET CELL PHONE"), whose service provider is T-Mobile USA, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.  The TARGET CELL PHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

3.      I am a Special Agent/Task Force Officer with the DEA and have been so since January 2018.  I am currently a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation and I have approximately 20 years of law enforcement experience. I have specialized training and experience in narcotics smuggling and distribution investigations. During my law enforcement career, I have participated in numerous narcotics investigations and have authored numerous affidavits supporting criminal complaints and search

and seizure warrants. I have debriefed multiple defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with narcotics traffickers' methods of operation including communications via Facebook messenger, cellular telephone/smart phone applications, text messaging services, and other traditional forms of communications. I am further familiar with narcotics traffickers' methods including distribution, storage, importation, and transportation of narcotics, the collection of money which represents the proceeds of narcotics trafficking and money laundering. In the course of my work, I have become knowledgeable with the enforcement of federal laws pertaining to narcotics and dangerous drugs. I have participated in drug trafficking investigations conducted by the Wisconsin Department of Justice, Division of Criminal Investigations (DCI), HSI, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances. I am currently a member of the North Central High Intensity Drug Trafficking Area (HIDTA) Task Force assigned to the drug gang task force as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Throughout this affidavit, reference will be made to

2

case agents or investigators. Case agents or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

5.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute heroin and distribution of heroin) have been committed, are being committed, or will be committed by Rene SUAREZ (a/k/a "Pelon"), Jose Alberto SILVA-Jimenez, Javier MERCED and others.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

6.    The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.    The United States, including HSI and the DEA, is conducting a criminal investigation of Rene SUAREZ (a/k/a "Pelon"), Jose Alberto SILVA-Jimenez, Javier MERCED and others regarding possible violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute heroin and distribution of heroin).

8.    In April 2019, members of North Central High Intensity Drug Trafficking Area (HIDTA) DEA Group 63 and Group 68, along with the West Allis, WI Police Department, initiated an investigation into individuals distributing heroin throughout Milwaukee, Wisconsin.

3

HIDTA identified the individuals involved in this heroin distribution as, among others, Jose Alberto SILVA-Jimenez, Rene SUAREZ (a/k/a "Pelon") and Javier MERCED.

9. Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant also uses covert recording and monitoring devices. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, telephone calls made by the informant while under the direction and control of case agents are recorded.

## CS-1 Information

10. In April 2019, a confidential source (hereinafter CS-1) provided information to law enforcement naming Jose Alberto SILVA-Jimenez as a heroin distributor and broker facilitating heroin transactions in Milwaukee, WI. CS-1 has prior arrests in Puerto Rico for Dangerous Drugs – Tentative or Conspiration Marijuana, Weapons Law (Aggravated) – no disposition; and prior arrests in Wisconsin for Maintain a Drug Trafficking Place, and Possession with Intent to Distribute cocaine, heroin and THC – charges remain pending.

## Controlled Purchases Involving SILVA-Jimenez, MERCED and SUAREZ

### *April 30, 2019 Controlled Purchase*

11. On April 29, 2019, CS-1 notified law enforcement that SILVA-Jimenez offered to sell CS-1 an ounce of heroin for $1,800. Prior to the drug transaction, SILVA-Jimenez

4

instructed CS-1 to call him when CS-1 was near the area of 95th and Oklahoma Street in Milwaukee, WI. On April 30, 2019, CS-1 met with SILVA-Jimenez at the Evergreen Village apartments located at 96th and Oklahoma Street. Law enforcement observed SILVA-Jimenez enter a garage, close the door and emerge a short time later after calling CS-1. Law enforcement saw SILVA-Jimenez entering CS-1's vehicle where he provided CS-1 approximately 25.02 grams of a brown substance, which later field-tested positive for the properties of heroin.

*May 22, 2019 Controlled Purchase*

12. On May 22, 2019, CS-1 informed law enforcement SILVA-Jimenez had called CS-1. SILVA-Jimenez explained to CS-1 that he was currently in Puerto Rico and would be returning to Milwaukee, WI at the end of the month. SILVA-Jimenez further explained to CS-1 that he could arrange a heroin transaction if CS-1 wanted to purchase heroin for further distribution. At the direction of law enforcement, CS-1 agreed to purchase 20 grams of heroin from SILVA-Jimenez for $1,400. On May 22, 2019, SILVA-Jimenez instructed CS-1 to park in the area of North 19th and Highland Avenue in Milwaukee, WI. Once in that area, SILVA-Jimenez called CS-1 and said SILVA-Jimenez's "worker," wearing a burgundy shirt and hat, would be the person supplying the heroin to CS-1. A short time later, law enforcement observed an Hispanic male, who matching SILVA's description of the "worker," exit the apartment complex located at 1924 W. Highland Avenue. CS-1 met the unknown Hispanic male at the apartment complex's perimeter fence and conducted the heroin transaction. The unknown Hispanic male provided CS-1 with approximately 20.02 grams of a brown substance, which field-tested positive for the properties of heroin.

5

*July 22, 2019 Controlled Purchase*

13.     On July 22, 2019, CS-1 informed law enforcement SILVA-Jimenez offered to sell CS-1 an ounce of heroin for $1,900.  SILVA-Jimenez had returned to Milwaukee from his trip to Puerto Rico.  At the direction of law enforcement, CS-1 agreed to purchase the heroin from SILVA-Jimenez.  Similar to the April 30, 2019 heroin transaction, SILVA-Jimenez instructed CS-1 to meet SILVA-Jimenez at the Evergreen Village apartment complex.  CS-1 contacted SILVA-Jimenez upon arrival to the Evergreen Village apartments.  Shortly thereafter, law enforcement observed SILVA-Jimenez exit the apartment complex and enter CS-1's vehicle. SILVA-Jimenez provided CS-1 with three plastic baggies containing a brown substance.  After the drug transaction, the brown substance, weighing approximately 26.82 grams, tested positive for the properties of heroin.

*March 4, 2020 Controlled Purchase*

14.     On March 3, 2020, CS-1 informed law enforcement SILVA-Jimenez had once again returned to Puerto Rico.  CS-1 told law enforcement during a phone conversation that SILVA-Jimenez offered to sell CS-1 25 grams of heroin for $1,750.  SILVA-Jimenez would provide CS-1 the telephone number for SILVA-Jimenez's "worker," who would conduct the heroin transaction with CS-1 in SILVA-Jimenez's absence.  On March 4, 2020, SILVA-Jimenez texted CS-1 the telephone number for the "worker."  Later that same day, CS-1 called the "worker."  CS-1 and the "worker" agreed to meet at an Amaco gas station near South 60th Street and West Oklahoma Avenue in Milwaukee.  Law enforcement surveillance units observed a blue BMW arrive at the Amaco gas station.  CS-1 then arrived to the gas station.  An Hispanic male was seen exiting the blue BMW and entering CS-1's vehicle.  The Hispanic male (i.e., the "worker") provided CS-1 three baggies, individually labeled, "10," "10," and "5."  All three

6

baggies weighed approximately 24.81 grams and contained a brown substance, which field-tested positive for the properties of heroin. Law-enforcement records checks revealed that the blue BMW driven by the "worker" was registered to Jose SILVA-Jimenez. After the heroin transaction, law enforcement positively identified the "worker" as Javier MERCED, a resident of Milwaukee, WI. Law enforcement followed MERCED to the residence of 3466 S. 62nd Street, Milwaukee, WI. Law-enforcement records checks associated MERCED with the residence and MERCED's Wisconsin Driver's license lists 3466 S. 62nd Street as his address. The photograph depicted on MERCED's driver's license matches the individual observed by law enforcement on the day of the aforementioned heroin transaction.

*September 1, 2020 Controlled Purchase*

15.     On July 16, 2020, CS-1 informed law enforcement SILVA-Jimenez had called CS-1 from Puerto Rico. During the call, SILVA-Jimenez provided CS-1 telephone number (661) 218-1188, which was the phone number for SILVA-Jimenez's heroin source-of-supply in Chicago, IL. SILVA-Jimenez told CS-1 the source-of-supply would be expecting a phone call from CS-1 to arrange a future heroin transaction. On July 17, 2020, CS-1 placed a recorded call to (661) 218-1188. During the recorded conversation in Spanish, the source-of-supply only identified himself as "Pelon." "Pelon" agreed to sell 50 grams of heroin to CS-1 for $3,500. According to CS-1, SILVA-Jimenez previously explained that he always conducted his heroin transactions with "Pelon" at a George Webb restaurant in the area of 92nd and Oklahoma Street in Milwaukee, WI. SILVA-Jimenez further explained to CS-1 that "Pelon" would deliver no less than 50 grams of heroin from Chicago, IL to Milwaukee, WI. During the July 17, 2020 recorded call, CS-1 and "Pelon" agreed to meet at the aforementioned George Webb restaurant to conduct the heroin transaction on July 20, 2020. On July 20, 2020, law enforcement met with CS-1 to

7

arrange the heroin transaction for that morning. The transaction was canceled, however, because "Pelon" had vehicle issues during his travel from Chicago to Milwaukee.

16.     On August 27, 2020, CS-1 placed a recorded to SILVA-Jimenez. During the recorded call, SILVA-Jimenez explained to CS-1 that "Pelon" was concerned about traveling between Illinois and Wisconsin due to COVID-19 pandemic restrictions. CS-1 informed SILVA-Jimenez there were currently no COVID-19 travel restrictions between the respective states. SILVA-Jimenez informed CS-1 that he would contact "Pelon" and arrange the transaction. On August 28, 2020, CS-1 informed law enforcement that SILVA-Jimenez arranged a 50-gram heroin transaction with PELON, which would be conducted at the Lake Forest Oasis in Illinois.

17.     On September 1, 2020, CS-1 placed a recorded call to SILVA-Jimenez advising SILVA-Jimenez that CS-1 was prepared for the transaction and would be on time. Law enforcement subsequently observed CS-1 meet "Pelon" at the McDonald's restaurant inside the Lake Forest Oasis. CS-1 provided "Pelon" money, which was concealed inside a McDonald's bag. "Pelon" informed CS-1 the heroin was located inside a Dunkin' Donuts bag, which he provided to CS-1. After the transaction, CS-1 gave the Dunkin' Donuts bag to law enforcement. The Dunkin' Donuts bag contained approximately 50.23 grams of a brown substance, which field-tested positive for the properties of heroin.

*October 27, 2020 Controlled Purchase*

18.     On October 21, 2020, CS-1 contacted SILVA-Jimenez. Over a series of recorded conversations, SILVA-Jimenez and CS-1 agreed to a 100-gram heroin transaction for $6,000 to be conducted with "Pelon." SILVA-Jimenez brokered the heroin transaction from Puerto Rico and arranged for CS-1 to again meet "Pelon" at the Lake Forest Oasis on October 27, 2020.

19.     On October 27, 2020, law enforcement observed a black Cadillac Escalade bearing IL license plate ROXSAND. The driver of the Escalade resembled "Pelon." According to law enforcement databases, the Cadillac Escalade bearing IL license plate ROXSAND is registered to "ROXSAND HAULING CONTRACTORS," 4319 N Central Park Avenue, Cicero, IL 60618, and in the name Rene SUAREZ. Law enforcement record checks of SUAREZ indicate IL driver's license S62072088153 with the same registered address as the Cadillac Escalade. The person represented in the IL driver's license photograph for SUAREZ appeared to be the same individual observed by law enforcement at the Lake Forest Oasis on September 1, 2020 and October 27, 2020. In other words, SUAREZ was "Pelon."

20.     On October 27, 2020, law enforcement observed CS-1 meeting SUAREZ at the McDonald's restaurant inside the Lake Forest Oasis. Law enforcement observed CS-1 give a McDonald's bag, which contained $6,000, to SUAREZ. In exchange, law enforcement observed SUAREZ provide CS-1 a Dunkin' Donuts bag. On this occasion, SUAREZ gave CS-1 his telephone number, i.e., (312) 834-6433 (TARGET CELL PHONE). SUAREZ told CS-1 to contact SUAREZ on the TARGET CELL PHONE for future heroin transactions. After the transaction, CS-1 provided law enforcement the Dunkin' Donuts bag. The bag contained approximately 100.7 grams of a brown substance, which field-tested positive for the properties of heroin.

21.     Law enforcement subsequently served a Subpoena to T-Mobile USA, the TARGET CELL PHONE's service provider. Subpoena results from T-Mobile USA list the TARGET CELL PHONE is registered to Rene SUAREZ, 4319 N. Central Park Avenue, Chicago IL 60618.

9

*December 3, 2020 CS-1 recorded call to the TARGET CELL PHONE*

22.     On December 3, 2020, at approximately 8:00 a.m., CS-1 called the TARGET CELL PHONE to discuss a future drug transaction of 100 grams of heroin. During the recorded call, CS-1 asked, "[Is] there any of the same (i.e., heroin), 100 (i.e., 100 grams)? I'm going to see the black male today to see what he tells me." SUAREZ replied, "Yes, yes, yes, always." CS-1 asked, "There is always some (i.e., heroin)?" SUAREZ replied, "Yes."

23.     On December 3, 2020, HSI Special Agent Jeremy Dorn obtained a Federal search warrant, signed by U.S. Magistrate Judge Stephen C. Dries, for information about the location (i.e., GPS data, E-911 Phase II data) of the TARGET CELL PHONE for a period of thirty (30) days.

*December 10, 2020 Controlled Purchase*

24.     On December 8, 2020, CS-1, under the direction and control of TFO Evelyn Lazo, placed a recorded call to SUAREZ. SUAREZ, utilizing the TARGET CELL PHONE, answered the call and CS-1 arranged a heroin transaction for Thursday, December 10, 2020. SUAREZ agreed to meet CS-1 at Pleasant Prairie Outlets located at 10551 120th Ave, Pleasant Prairie, WI. The CI asked SUAREZ the cost of the heroin and SUAREZ stated "70" (i.e. $70.00 per gram of heroin). In a subsequent telephone call, SUAREZ, utilizing TARGET CELL PHONE agreed to lower the price of the heroin, and confirmed a 100-gram heroin transaction in exchange of $6,000.

25.     On December 10, 2020, CS-1 received a text message from the TARGET CELL PHONE, indicating that SUAREZ was on his way to meet with CS-1. CS-1 made a subsequent recorded telephone call to SUAREZ, advising that CS-1 would meet with SUAREZ in the rear parking lot of the McDonalds restaurant, located at 10551 120th Ave., Pleasant Prairie, WI.

During surveillance, law enforcement observed SUAREZ arrive on scene, operating a red convertible, Mitsubishi Eclipse, bearing IL registration plate AN36716. SUAREZ was then observed exiting the Mitsubishi and entering the McDonalds restaurant. A short time later, SUAREZ exited the McDonalds restaurant and walked on foot, towards CS-1's vehicle. SUAREZ entered the vehicle, carrying a McDonalds food bag. During the transaction, SUAREZ provided CS-1 with the 100 grams of heroin and CS-1 then provided SUAREZ with $6000 in pre-recorded US currency. After the transaction, CS-1 provided law enforcement the bag containing the purported heroin. The bag contained approximately 112.84 grams of a brown/gray chunky substance, which field-tested positive for the properties of heroin.

26.     After the controlled purchase, aerial and ground surveillance was maintained on SUAREZ as he left the McDonalds. SUAREZ drove south on I-94 toward Illinois. Law enforcement followed SUAREZ to a residence located at 1904 S. 58th Ave., Cicero, IL. In the alley behind the residence, investigators observed an open garage affiliated with that residence. SUAREZ backed his vehicle into the garage. SUAREZ subsequently exited the garage and walked on a walkway adjacent to the residence. Agents observed SUAREZ unlock a door to the residence and enter 1904 S. 58th Ave, Cicero, IL. GPS/E-911 data further suggested that 1904 S. 58th Ave., Cicero, IL was SUAREZ's residence given that the data indicated the TARGET CELL PHONE was in the vicinity of that residence during typical hours of rest (i.e., the evening through early morning).

*Suspicious international travel by SUAREZ to California and Mexico*

27.     On December 19, 2020, SUAREZ purchased plane tickets to Puerto Vallarta, Mexico. On December 22, 2020, SUAREZ departed from Los Angeles International Airport (LAX). On December 19, 2020, the same date SUAREZ purchased his tickets, GPS/E-911

11

location data indicated SUAREZ began traveling west. On December 21, 2020, at approximately 8:30 p.m., SUAREZ arrived in Los Angeles, California. On the same date, HSI SA Jeremy Dorn contacted HSI SA Eric Barrett, who is assigned to the LAX field office, and requested SA Barrett conduct surveillance at the LAX departure terminal to see if SUAREZ was traveling to Mexico with anyone. On December 22, 2020, SA Barrett observed SUAREZ alone at the LAX departure terminal. On December 28, 2020, SUAREZ returned from Mexico at LAX and subsequently drove to his residence in Illinois where he arrived on December 31, 2020.

28. Law enforcement records-checks revealed that SUAREZ's family members and girlfriend traveled from Chicago to Puerto Vallarta, Mexico around the same time SUAREZ would have been in Mexico. On December 28, 2020, the family members and girlfriend flew from Mexico to Chicago. SUAREZ evidently traveled separately on his journey to Mexico and his return to Chicago (including the cross-country drive to his Chicago residence). Based on my training and experience, and knowledge of the investigation, SUAREZ's unusual travel pattern to and from a known source country for controlled substances suggested he was engaged in illicit activity. Individuals who are involved in trafficking controlled substances and money laundering often conceal their movements from law enforcement, engage in clandestine meetings with other co-conspirators, and have varied methods of travel.

*January 22, 2021 phone conversation establishing a future heroin purchase*

29. On January 22, 2021, CS-1 called the TARGET CELL PHONE, used by SUAREZ. During the recorded conversation, CS-1 asked if SUAREZ had "any work," meaning he wanted to know if SUAREZ had heroin. SUAREZ replied, "Yes, yes, yes, I was waiting for you to call me." CS-1 told SUAREZ s/he wanted 100 grams of heroin as in previous

12

transactions. CS-1 told SUAREZ s/he would gather money and call SUAREZ on January 25, 2021 to arrange the heroin transaction for either January 26, 2021 or January 27, 2021. SUAREZ told CS-1 the heroin transaction would have to take place no later than January 26, 2021 because he would not be available on January 27, 2021. CS-1 indicated a call would be placed to SUAREZ on January 25, 2021 to finalize the details of the drug transaction. SUAREZ and CS-1 agreed to conduct the heroin transaction again at the McDonald's restaurant, located at 10551 120th Ave, Pleasant Prairie, WI.

30. On January 25, 2021, DEA TFO Todd Higgins obtained a Federal search warrant, signed by U.S. Magistrate William E. Duffin, for information about the location (i.e., GPS data, E-911 Phase II data) of the TARGET CELL PHONE for a period of thirty (30) days.

*February 9, 2021 Controlled Purchase*

31. On February 8, 2021, CS-1, under the direction and control of TFO Evelyn Lazo, placed a recorded call to SUAREZ. SUAREZ, utilizing the TARGET CELL PHONE, answered the call and CS-1 arranged a heroin transaction for Tuesday, February 9, 2021. SUAREZ agreed to meet CS-1 at the Lake Forest Oasis, located in Lake Forest, IL, sometime around 9:00 a.m. The CS-1 informed SUAREZ that CS-1 would call SUAREZ the following day, to confirm the exact time of the heroin transaction.

32. On February 9, 2021, CS-1, under the direction and control of TFO Evelyn Lazo, placed a recorded call to SUAREZ. During the call, SUAREZ, utilizing the TARGET CELL PHONE, agreed to meet CS-1 at the McDonalds located inside the Lake Forest Oasis to conduct a 100 gram heroin transaction. Prior to the controlled buy, agents initiated surveillance at SUAREZ's residence, i.e., 1904 S. 58th Ave., Cicero, IL. DEA Air Wing also conducted aerial surveillance on SUAREZ, as SUAREZ left the residence in a black Cadillac Escalade. Aerial and

ground personnel maintained surveillance on SUAREZ as he drove to the meet location (i.e., the Lake Forest Oasis).

33. On February 9, 2021, law enforcement observed CS-1 meet SUAREZ at the McDonald's restaurant inside the Lake Forest Oasis. While waiting in line at the McDonalds, SUAREZ told the CS-1 that there were three suspicious subjects sitting by the restaurants and SUAREZ advised CS-1 that SUAREZ wanted to conduct the heroin transaction either in the public restroom area or outside the Lake Forest Oasis. A short time later, CS-1 and SUAREZ exited the Lake Forest Oasis. Law enforcement observed SUAREZ and CS-1 enter CS-1's vehicle. While inside vehicle, CS-1 gave SUAREZ $6,000 in prerecorded U.S. currency. SUAREZ removed the suspected heroin from his jacket and placed it in the glove box of CS-1's vehicle. After the transaction, CS-1 gave law enforcement the suspected heroin, which was contained inside a plastic bag. The plastic bag contained approximately 107.18 grams of a brown and gray substance, which field-tested positive for the properties of heroin.

*Intelligence Regarding Jose MARTINEZ, MTZ Trucking Services and Rafael MONTANO/Gilardo CRUZ*

34. On February 8, 2020, law enforcement initiated surveillance at 1904 S. 58th Ave., Cicero, IL. At approximately 11:48 a.m., DEA TFO Nick Stachula observed a red 2009 Mitsubishi convertible, bearing IL plate number AN36716, registered to Adrian GALLARDO-ARZETA of 1904 S. 58th Ave, Cicero, IL, exiting the garage of 1904 S. 58th Ave. Cicero, IL. TFO Stachula had learned of a DEA investigation identifying Adrian GALLARDO-ARZETA, the driver of a red 2009 Mitsubishi convertible (bearing IL plate number AN36716), who provided a confidential source approximately 35 grams of heroin, with the intention to subsequently supply the confidential source a kilogram of heroin, in January 2019.

14

35.     During surveillance, your Affiant positively identified SUAREZ as the driver of the red 2009 Mitsubishi.  Law enforcement maintained surveillance as SUAREZ proceeded south from his residence.  TFO Stachula observed SUAREZ enter the front public entrance to an industrial park.  DEA SA Dean Kazamias entered the industrial park and observed SUAREZ park at MTZ Trucking, which is located at 3650 S. Homan Ave. Chicago, IL.  Law enforcement observed SUAREZ speak to other individuals in the parking lot.   On the front of MTZ Trucking's gate, the business displayed a MTZ Trucking sign listing the telephone numbers 773-580-3095 and 773-533-2121.   Through law enforcement and HSI databases, the telephone number of 773-580-3095 was linked to an individual identified as Jose MARTINEZ. Furthermore, GPS/E-911 data for the TARGET CELL PHONE revealed that the TARGET CELL PHONE had been "pinging" on almost a daily basis at MTZ Trucking, during varying hours of the day. Based on surveillance, SUAREZ did not appear to be an MTZ Trucking employee or a truck driver.  Based on his observed actions, SUAREZ appeared to be directing the individuals around him in the parking lot, much like someone in a leadership role.

36.     TFO Stachula identified another related DEA case, which involved a 2010 cocaine-trafficking investigation of Rafael MONTANO, a subject affiliated with Ocean to Ocean Transport, located at 5200 W. 47th St., Chicago, IL.  During this investigation, law enforcement attempted to contact MONTANO'S associates.   In particular, investigators contacted Jose MARTINEZ (identified as the owner of MTZ Trucking) and Jose Luis LOPEZ-GOMEZ.  Both MARTINEZ and LOPEZ-GOMEZ indicated 6631 S. Kostner, Chicago, IL as their residence. MARTINEZ said he was employed by Gilardo CRUZ, a truck mechanic, and knew MONTANO through CRUZ.  MARTINEZ said his cellular telephone number was 773-580-3095 and gave investigators consent to search his cellular telephone. During the search, agents located the

15

telephone numbers of CRUZ and MONTANO. Investigators identified tractor trailers associated with MONTANO's business at 5200 W. 47th St., Chicago, IL. Although a narcotics-detecting K-9 alerted to the trailers, no controlled substances were found at that time. TFO Stachula, however, conducted a background investigation on MONTANO, and learned he had a criminal history involving trafficking kilogram-level amounts of cocaine.

37.     On February 24, 2021, DEA TFO Todd Higgins obtained a Federal search warrant, signed by U.S. Magistrate William E. Duffin, for information about the location (i.e., GPS data, E-911 Phase II data) of the TARGET CELL PHONE for a period of thirty (30) days.

*March 19, 2021 Controlled Purchase*

38.     On March 17, 2021, CS-1, under the direction and control of TFO Jose Arzaga, placed a recorded call to SUAREZ. SUAREZ, utilizing the TARGET CELL PHONE, answered the call and CS-1 arranged a heroin transaction for Friday, March 19, 2021. SUAREZ agreed to meet CS-1 at the Lake Forest Oasis, located in Lake Forest, IL, sometime around 9:00 a.m. The CS-1 informed SUAREZ that CS-1 would call SUAREZ on Friday, to confirm the exact time of the heroin transaction.

39.     On March 19, 2021, CS-1, under the direction and control of TFO Jose Arzaga, placed a recorded call to SUAREZ. During the call, SUAREZ, utilizing the TARGET CELL PHONE, agreed to meet CS-1 at the Lake Forest Oasis to conduct a 100 gram heroin transaction. During surveillance of the controlled purchase, law enforcement observed SUAREZ's Mitsubishi Eclipse parked in the east side parking lot of the Lake Forest Oasis. A short time later, law enforcement observed SUAREZ exit the west exit doors of the Lake Forest Oasis. SUAREZ then entered CS-1's vehicle. While inside vehicle, CS-1 gave SUAREZ $6,000 in prerecorded U.S. currency. SUAREZ removed the suspected heroin from his person and placed

16

it in the glove box of CS-1's vehicle. After the transaction, CS-1 gave law enforcement the suspected heroin, which was contained inside a plastic bag. The plastic bag contained approximately 102.295 grams of a brownish-gray substance, which field-tested positive for the properties of heroin.

40.     On March 24, 2021, investigators obtained a Federal search warrant, signed by U.S. Magistrate William E. Duffin, for information about the location (i.e., GPS data, E-911 Phase II data) of the TARGET CELL PHONE for a period of thirty (30) days.

*April 27, 2021 phone conversation establishing a future heroin purchase*

41.     On April 27, 2021, CS-1 called the TARGET CELL PHONE, used by SUAREZ. The telephone call was unanswered by SUAREZ; however, minutes later, CS-1 received a telephone call from the TARGET CELL PHONE. During the recorded conversation, CS-1 asked SUAREZ if he could meet the following day, meaning he wanted to know if SUAREZ had heroin available for purchase. CS-1 told SUAREZ s/he wanted "the same," meaning s/he again wanted 100 grams of heroin, as on the previous occasions. CS-1 and SUAREZ agreed to meet the following day (i.e., April 28, 2021), at 9:00 a.m., by the "food." In a subsequent recorded call between CS-1 and SUAREZ, CS-1 was able to confirm that the meet location would be at the McDonalds, located in Pleasant Prairie, Wisconsin.

42.     In my training and experience, I have learned that T-Mobile USA is a company that provides cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data

17

provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the pho]ne or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

43. Based on my training and experience, I know that T-Mobile USA can collect E-911 Phase II data about the location of the TARGET CELL PHONE, including by initiating a signal to determine the location of the TARGET CELL PHONE on T-Mobile USA's network or with such other reference points as may be reasonably available.

44. Based on my training and experience, I know that T-Mobile USA can collect cell-site data on a prospective basis about the TARGET CELL PHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile USA typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

18

## AUTHORIZATION REQUEST

45.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.  The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the TARGET CELL PHONE, without geographic limit, for a period of forty-five days (45) days pursuant to 18 U.S.C. § 3123(c)(1).

46.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the TARGET CELL PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

47.     I further request that the Court direct T-Mobile USA to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile USA.  I also request that the Court direct T-Mobile USA to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile USA's services, including by initiating a signal to determine the location of the TARGET CELL PHONE on T-Mobile USA's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate T-Mobile USA for reasonable expenses incurred in furnishing such facilities or assistance.

48.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET CELL PHONE outside of daytime hours.

49.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

## ATTACHMENT A

### Property to Be Searched

1.      The cellular telephone assigned call number (312) 834-6433, with listed subscriber Rene Suarez (the "TARGET CELL PHONE"), whose wireless communications service provider is T-Mobile USA, headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

2.      Records and information associated with the TARGET CELL PHONE that is within the possession, custody, or control of T-Mobile USA, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

All information about the location of the TARGET CELL PHONE described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the TARGET CELL PHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile USA, T-Mobile USA is required to disclose the Location Information to the government. In addition, T-Mobile USA must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile USA's services, including by initiating a signal to determine the location of the TARGET CELL PHONE on T-Mobile USA's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile USA for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute a controlled substance and distribution of a controlled substance) involving Rene SUAREZ (a/k/a "Pelon"), Jose Alberto SILVA-Jimenez, Javier MERCED and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

3